[Civ. No. 375.   Third Appellate District.—November 1, 1907.]

## JOHN WILLIAMS, Respondent, v. SAN FRANCISCO AND NORTHWESTERN RAILWAY COMPANY, Appellant.

NEGLIGENCE—OBSTRUCTION OF HIGHWAY BY RAILWAY COMPANY—FRIGHTENED HORSE—COLLISION.—The right of the driver of a horse and buggy on a public highway near a railroad track, to the use of an unobstructed highway as against a steam railway company, is equal to that of the railway company to use its track in its usual and customary manner. It is negligence for the railway company to obstruct part of the highway with a large wood-pile, and in doing so it ought reasonably to anticipate that horses on the highway may become frightened by passing trains, and may cause a collision of a wagon or buggy therewith, to the injury or death of the driver.

ID.—ACTION FOR DEATH—PROXIMATE CAUSE OF DEATH.—In an action for death caused by the alleged negligence of the railway company in obstructing the highway with such wood-pile, where it appears that the frightening and speeding of the horse driven by the deceased was by reason of a passing train going in the same direction toward the wood-pile, and that the collision of the buggy therewith resulted in immediate death, the negligence of the defendant in obstructing the highway, and not the mere fright of the horse, was the proximate cause of the death.

ID.—QUESTION OF FACT—NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—SUPPORT OF VERDICT.—The negligence of the defendant, and the contributory negligence of the plaintiff were properly submitted to the jury as questions of fact, and their verdict for the plaintiff will not be disturbed upon appeal, where the court properly declared the questions of law applicable to the facts, and the evidence fully supports the verdict.

ID.—SPECIAL ISSUES NOT INCONSISTENT WITH GENERAL VERDICT—REQUESTS PROPERLY REFUSED.—Requests for special issues by the defendant, a decision on which adverse to the plaintiff would not be inconsistent with the general verdict for the plaintiff, were properly refused by the court as inconsistent, and some of them were also properly refused as being misleading in form.

APPEAL from a judgment of the Superior Court of Humboldt County.   E. W. Wilson, Judge.

The facts are stated in the opinion of the court.

Gillett & Cutler, Pillsbury, Madison & Sutro, and Chas. L. Brown, for Appellant.

Gregor & Connick, for Respondent.

HART, J.—This is an action for damages for causing the death of plaintiff's wife. The case was tried by a jury and plaintiff secured a verdict and judgment for the sum of $3,000. From said judgment, upon a bill of exceptions, the defendant presents this appeal.

The facts as established by the evidence and found by the jury are: The defendant corporation owns and operates a steam railroad about twenty-five miles in length, between the city of Eureka, in Humboldt county, to some point beyond the town of Scotia, in said county. On the line of the road are situated the towns of Fortuna and Singley's Station, the latter being about three miles in a northerly direction from the former. A county road, used for many years by the traveling public as a public highway, runs between and connects these towns or railroad stations. On the twenty-third day of July, 1903, while the wife of the plaintiff was on her way to Fortuna, in a buggy, drawn by a horse, driven by herself, and at a point between the two stations mentioned, a train of cars belonging to the defendant came along and the noise produced by the engine and the train caused the animal to become frightened and to start on a wild run over the road toward and in the direction of Fortuna. The right of way and track of defendant adjoin and parallel said public highway for a considerable distance. At a point on said county road, about one mile from Fortuna, was situated, on the day the fatal accident occurred, a large pile of wood, the property of the defendant. The complaint alleges and it appears to be satisfactorily shown by the evidence, that one corner of said wood-pile extended over and projected into a portion of said public highway for a distance of approximately two feet. When the animal, running at a lively rate, reached the point at which the wood-pile was situated, the buggy struck or collided with that portion of the wood extending into the highway, the impact resulting in the overturning of the vehicle and throwing the deceased to the ground with such violence as to produce fatal injuries, death being almost instantaneous. There does not appear to be

any attempt to contradict the claim of the plaintiff that the wood-pile with which the buggy collided occupied a part of the public highway, although not the traveled portion; but it is contended by the defendant, and there is no dispute upon the proposition, that that part of said highway so used by the defendant had been thus used by it for many years prior to the day upon which the unfortunate mishap occurred, and that, notwithstanding the existence of the obstruc-· tion, there was still left sufficient room in the highway at that point to facilitate and admit of the ordinary and customary use of the road by the traveling public.

Those persons who saw the horse start to run and watched the animal running as far as the circumstances by which they were situated would permit them were passengers on the train, the noise from which caused the animal to become frightened. Testifying for the plaintiff, they all stated that the horse ran so fast that he kept up with the speed of the train; that the deceased seemed to be holding the animal with taut reins, and that she appeared to be perfectly calm, cool and "collected," evincing no signs of the loss of control of her judgment; that "the woman was sitting firmly in the buggy seat," and "I should judge," testified the witness Robertson, "her feet were well braced, and she was holding her arms in a driving position; she had hold of both lines, one in each hand, was holding them tight and was guiding the horse." Some of the witnesses testified that on the day following that upon which the accident occurred, they followed the track made by the vehicle used by the deceased from a point a considerable distance from the wood-pile to the latter point, and that the buggy was kept in the center of the road until it struck said wood-pile. The wood-pile consisted of three tiers of "two-foot" wood. The width of the road, measuring from the outer edge of the wood-pile to the fence on the opposite side of the highway, was about twenty feet, of which about twelve feet were graveled.

On behalf of the defendant testimony was offered to the effect that the projection of the wood-pile into the highway did not interfere with or obstruct the customary travel upon it. The witness Newell said that the corner of the wood-pile projected upon the graveled portion of the road, and that "if one was to use the whole of that road that was turnpiked and graveled he would get pretty near the edge of the

wood-pile.'' It also appears that just a short distance from
where the wood-pile was situated there is rather a sharp
curve in the road, around which the horse ran at a high rate
of speed, going in the direction of said wood-pile. Newell
declared that said curve ''was a difficult one to make if the
horse was running fast.'' Testimony was also introduced by
the defendant tending to show that the horse driven by the
deceased was high-spirited and easily excited, and that the
''bridle-bit'' used on the animal at the time of the accident
was not of the kind which should be used on a horse of an
excitable and unruly nature; that it was the ''bit'' ordinarily
used on horses, and with which it would be difficult, if not
impossible, to stop a frightened horse in the act of ''running
away.'' The witness Quill, a livery-man, who sold the mare
in question to the plaintiff in the year 1901, testified that the
animal was of racing stock and a ''saddle-horse''; that he
had driven her himself, but that no one else had up to the
time that he sold her to plaintiff; that he told the latter, at
the time of the sale, that the mare was ''very high-lifed and
hard to handle when she got warmed up, and was all right,
except when she got excited.'' This witness said that, after
selling the mare to plaintiff, she had foaled a colt, and that
he knew ''from experience that sometimes having a colt has
a quieting effect upon a mare,'' and that said mare was
much quieter after she had the colt; that he had often seen
plaintiff drive the mare, and that on such occasions ''she was
going along like any ordinary horse would.'' Testimony was
introduced in rebuttal to show that the deceased had often
driven the mare, taking with her in the buggy at different
times certain ladies, who said that the mare always behaved
well on those occasions. The deceased was described as a
''large, strong, healthy woman,'' from which fact the infer-
ence is that she was capable, in point of physical strength, of
controlling the animal. The foregoing embraces, in sub-
stance, the principal testimony introduced by both sides, and
from which, of course, arise the legal propositions submitted
for solution.

The main questions discussed in the briefs involve and re-
volve around two propositions, viz.: 1. What was the proxi-
mate cause of the accident resulting in the death of plain-
tiff's wife? 2. Was plaintiff's right to recover barred by

negligence contributed either by himself or his wife or by both?

An important question is also presented in the contention of appellant that the court committed prejudicial error by its refusal to submit to the jury for findings thereon certain particular questions of fact requested in writing to be so submitted by the defendant.

The specific contentions of the appellant upon the merits of the record are: That the direct cause of the accident was the fright and running away of the horse, due, presumably, to the noise made by the locomotive and train; that the horse, after starting to run, became unmanageable and got beyond the control of the deceased, and that her inability to keep the animal in the middle or center of the road and thus have avoided the collision of the buggy with the wood-pile constituted upon her part such culpable negligence as to destroy a right of recovery in plaintiff; that deceased was guilty of negligence in driving an animal claimed to be "high-lifed," nervous and of an excitable nature. And, in connection with the question of the character of the horse driven by the deceased, it is also charged that the plaintiff himself was guilty of contributory negligence by the act of permitting his wife, unaccompanied by anyone capable of lending her effective assistance in the event the horse became frightened and unruly, to drive an animal which, it is contended, was shown by the evidence to be, at the time of the accident, high-spirited and of a highly nervous temperament, and so known to be at the time by the plaintiff, along or near a railroad track over which a train of cars was likely to pass at any moment. It is also contended that the obstruction did not interfere with the usual and customary use of the highway.

Before proceeding with an examination of the respective positions of the parties to this appeal, these three self-evident and undisputed propositions may be declared: 1. That the defendant had the right to run its train over its track in the usual and customary manner of running railway trains, propelled by steam power; 2. That the deceased had the right to use the public highway in the usual and customary manner in which such highways are used and designed to be used; 3. That no one has any lawful right to maintain an obstruction or purpresture of any character or nature upon a public

highway or road laid out for and dedicated to the purposes of public travel.

In connection with the first of the propositions thus stated, it may be said that there is no claim that the defendant's train of cars, the noise from which it is alleged frightened the horse driven by deceased, made, on the occasion of the accident, an unusual or unnecessary noise, but it is conceded that the noise thus made was only the usual and ordinary noise necessarily incident to the running of railway trains by means of a steam locomotive.

Was the act of the defendant, in maintaining the wood-pile upon an untraveled portion of the highway, culpable negligence, and if so, was said wood-pile the proximate cause of the accident, or, as we think the latter proposition may be as accurately and at the same time more explicitly stated, would the accident have occurred but for the maintenance of the wood-pile under the circumstances disclosed by the evidence? The theory of the appellant upon the law of the case may best be presented in the language of the following instruction which was requested by it and refused by the court: "I further instruct you that if you find from the evidence that the wood piled by defendant was off of the main traveled portion of the highway and at a place where it was not dangerous to persons driving along said highway in the customary and ordinary manner; and if you further find that the horse driven by plaintiff's said wife became frightened some distance from where said wood was piled and ran away, and got beyond her control and was unmanageable, and while so running away and beyond her control, left the well-beaten track of the road and ran to one side thereof and against the end of said wood, thereby causing her death, then I instruct you that the proximate cause of the accident was the fright and running away of the horse, and not the pile of wood against which the buggy collided, and you must find a verdict for the defendant."

The portion of the foregoing rejected instruction bearing upon contributory negligence was covered by other instructions of the court; but by the instruction, it will be observed, it was also sought to induce the court to tell the jury that, as a question of law, the fact that the wood-pile was "off of the main traveled portion of the highway and at a place where it was not dangerous to persons driving along said

highway in the *customary and ordinary manner,"* exculpated defendant from all blame and responsibility for the accident and its consequences. Our attention has been invited to no case decided in California in which the precise question presented by the rejected instruction, or a question arising upon facts substantially corresponding with those here, has been adjudicated. We have, however, devoted much time to an examination of all the cases cited by both sides from other jurisdictions in which a similar question, with its concomitant propositions, and growing out of facts in marked analogy to those of the case at bar, has been considered and decided. While those authorities appear to be (and in a few instances are) widely divergent and seem to present a contrariety of views upon the application of the principles of law involved in the class of cases to which the one under review belongs, a careful examination, analysis and comparison of them, as to the facts, will, we think, show that, generally speaking, whatever apparent difference there may be in the conclusions reached, is founded upon a distinction based upon the measure of liability resting upon a town or county, charged with the duty of maintaining public highways, and that attaching to an individual or private corporation, where damage results from a defect in such highways through the fault or default of the one or the other. For illustration, it has been held that the duty of the public authorities is fully discharged when the *traveled* portion of the road—that part which has been graveled, turnpiked or otherwise prepared for the purposes of the customary travel—is kept and maintained in proper repair and in such shape as to admit of the usual, ordinary and customary use. And while, as between the town or county or public authorities having supervision of public highways and the traveler, the latter will leave the portion of the road laid out and prepared for the customary use and travel and go upon and use the unprepared and customarily unused part at his own risk, he is nevertheless entitled to the unobstructed and uninterrupted use of the *entire width* of the highway as against the unlawful acts of other persons, either real or artificial. The principle, upholding the distinction suggested, and here sought to be stated is well explained in *Dickey* v. *Maine Telegraph Co.,* 46 Me. 485, as follows: ". . . But the right of travelers to use any part of a high-

6 Cal. App.—46

way, if they see fit, is not restricted by the limitation of the liability of the town in case of accident. A person may go out of the beaten track at his own risk, as between himself and the town, and yet be entitled to protection against the unlawful acts of other persons or corporations. Any part of the highway may be used by the traveler, and in such direction as may suit his convenience or taste. (Citing *Stinson* v. *Gardiner,* 42 Me. 248, [66 Am. Dec. 281].) No private person has a right to place or cause any obstruction which interferes with this right on any part of the highway, within its exterior limits. The extent of the liability of the town is no measure for such private person's liability. If the owner of the fee in the land, or any other person, should dig a pit, or stretch a cord, or place a pile of stones on the highway near the outer limit, and at a considerable distance from the traveled way, and a traveler passing, using due care, should be injured thereby, it would be no sufficient answer, to his claim for damages, to aver and prove that, under the circumstances, the town was not liable. The duty of the town is to perform a positive act in the preparation and preservation of a sufficient traveled road. *The duty of others is to abstain from doing any act by which any part of the highway would become more dangerous to the traveler than in a state of nature, or than in the state in which the town has left it.*'' (See, also, *State* v. *Berdette,* 73 Ind. 185, [38 Am. Rep. 117], and *Johnson* v. *Whitfield,* 18 Me. 286, [36 Am. Dec. 721].) In the last-named case it is said: ''It is contended that the owner of land adjoining a public highway may lawfully use that part of it which is not prepared for the public travel. His ownership and right of use, so far as may be consistent with the rights of the public, need not be questioned. But it is a mistake to suppose the public rights of travel are restricted to the prepared and usually traveled path. While the town has done its duty, when it has prepared a pathway of suitable width in such manner that it can be conveniently and safely traveled with teams and carriages, the citizens are not thereby deprived of the right to travel over the whole width of the way as laid out. And they have the right to do so without being subjected to other or greater dangers than may be presented by natural obstacles, or those occasioned by making and preparing the traveled path.''

The rule as stated in the foregoing authorities is supported by the soundest reason and the most salutary principles of justice, and meets with our approval. The court properly, in our opinion, refused to give to the jury an instruction which would have taken from it the question of whether the act of the defendant was culpable negligence. The situation here, according to the undisputed facts, is, that the appellant maintained an unlawful obstruction upon a public highway, paralleling which and in close proximity thereto was its railroad track, over which it operated and ran, by steam, its railroad trains. It is not denied that the buggy in which the deceased was driving collided with said obstruction, and that the collision caused the vehicle to upset and precipitate the deceased to the ground with such force as to cause her death. The rule is that the defendant is answerable in law for negligence proximate in causal relation to the damage; or, in other words, it is liable if the obstruction for the existence of which it was responsible was the direct cause of the accident, with its resulting damages. The difficulty, indeed insuperable, with which the courts and text-writers have been, and always will be, confronted with regard to the right of action founded in negligence, is to formulate an invariable, ironclad rule, applicable alike to all cases of personal injury, upon the question of the proximate cause of the damage, or "the connection between the negligent act or omission and the damage." It should, therefore, be a case in which there is very clearly wanting, under the evidence, the essential connection between the negligent act or omission and the damage to warrant the court in taking it from the jury, either through a motion for a nonsuit, or a direction to find for the defendant or the instructions. "The proximate cause of an event," say Shearman and Redfield, page 27 of volume 1 of the fifth edition of their treatise on the "Law of Negligence," "must be understood to be that which, in a natural and continuous sequence, unbroken by any new, independent cause, produces that event, and without which that event would not have occurred." But, say the same authors, very great difficulty has been found in determining what damages should be considered as flowing, in a "natural and continuous sequence," from an act of negligence, especially when it is not a matter of contract liability. The difficulty of laying down a rule which will include all possible cases has caused some of the

ablest judges to decline to state any fixed rule, thus indicating a disposition of the courts to leave all doubtful cases to the jury. The authors of the work from which we have just quoted have, however, undertaken to state a general rule as follows: "That a person guilty of negligence should be held responsible for all the consequences which a prudent and experienced man, fully acquainted with all the circumstances which in fact existed (whether they could have been ascertained by reasonable diligence or not) would, at the time of the negligent act, have thought reasonably possible to follow, if they had occurred to his mind." This formula is sensible and sound. Testing, therefore, the facts of the case at bar by the rule as thus declared, little, if any, difficulty is to be experienced, we think, in tracing the proximate cause of the damage to the negligent act of the defendant. That a horse, howsoever gentle he may be for ordinary driving purposes, is likely to become frightened upon the sudden approach of a steam railway train, producing its customary and necessary noise, is not only a reasonably possible but, in our opinion, a reasonably probable fact, which all men of experience and prudence must know. It is one of the contingencies which are likely to occur upon a highway adjacent to a railroad track over which a steam railway is operated, and of which a prudent person, familiar with facts existing within the domain of common human experience, must reasonably have known and thought, had it occurred to his mind. It is an event which it was possible would happen at any time under the existing and known circumstances, and one, therefore, which it was the defendant's duty to think of and consider when it established and maintained the obstruction complained of. It is, in other words, one of those probable occurrences under the circumstances shown here which the defendant, having full knowledge of said circumstances, must be held to have reasonably anticipated. The meeting or overtaking of passing teams by a railway train traveling over a track adjoining a public highway is an event which is likely to occur at any moment and which the owner of the railway must reasonably expect to happen. Therefore, had it "occurred to defendant's mind," fully acquainted, as it must be assumed to have been, with all the circumstances which in fact existed, it would have known that the consequences which might reasonably follow the frightening and consequent rapid running of the horse,

hitched to a buggy, on and over the highway would be the collision of the vehicle with the obstruction maintained by it upon said highway and resulting damage to either person or property or both, if the frightened animal ran in the direction of the point of obstruction.

As is said in *Borough of Pittston* v. *Hart*, 89 Pa. St. 391, so it is true here: "It is true that without the frightening of the horses, there would have been no accident; but the horse is naturally a timid animal, and is so liable to fright that those having charge of the public highways ought to make reasonable provision for a matter so common and so likely to happen at any time. Horses abound, but horses that never frighten, or are never fractious, are exceedingly rare, and if roads were to be constructed only for such animals, there must needs be but little traveling upon them."

The defendant was primarily at fault in maintaining the obstruction upon the highway. Its act was an act of trespass. It had no lawful right to thus use a public highway, although the part obstructed was not customarily used by the traveling public. But in principle it had just as much right to thus use the highway a distance of ten or twenty feet as two feet, although the danger of accident would be greater and the proof of negligence attended with less difficulty in the former than in the latter case. As was said in *Cohen* v. *Mayor etc.*, 113 N. Y. 532, [10 Am. St. Rep. 506, 21 N. E. 700, 4 L. R. A. 406] : "There is always reasonable ground for apprehending accidents from obstructions in the highways, and any person who wrongfully places them there or aids in so doing, must be held responsible for such accidents as may occur by reason of their presence." This declaration is, of course, subject to the qualification that the plaintiff has not, by his own default or negligence, contributed to the damage. And our own supreme court, in the case of *McKune* v. *Santa Clara etc.*, 110 Cal. 480, [42 Pac. 980], likewise holds that "one who maintains any unauthorized obstruction upon a highway by means of which another, through no fault of his own, is injured in person or property, is responsible in damages therefor."

The question here, it must be understood, is not whether the highway was dangerous only when a horse traveling over it became frightened and "ran away," but whether the highway, as maintained, is shown by the evidence to be dangerous

for use as such, and this fact was and is dependent for its establishment upon all the circumstances by which it was maintained and surrounded—its condition, width, closeness to places of danger, the probability of accidents originating primarily through circumstances to which it was peculiarly subject by reason of its unusual situation.    Nor is the question here, under the pleadings, whether the obstruction of the highway by the defendant involved the maintenance of a public nuisance.    The defendant is charged in the complaint with actionable negligence in maintaining an unauthorized obstruction, and whether such allegation was true or not depended on what the evidence established.    The evidence, it is true, developed facts showing that the obstruction constituted a public nuisance, for the maintenance of which the defendant might have been criminally prosecuted.    (Pen. Code, sec. 370.)    And if the plaintiff, by his averments and proofs, had relied upon the theory of a public nuisance, the negligence so established would be such *per se.*    But, as suggested, the theory of negligence advanced is independent of any consideration of whether the obstruction was a public nuisance, and upon that theory the whole question was one for the jury. "The decision of such questions," says the supreme court of Pennsylvania, in *Plymouth Tp.* v. *Graver,* 125 Pa. St. 34, [11 Am. St. Rep. 867, 17 Atl. 249], "is most appropriately made by submission of them to the practical judgment and experience of a jury, upon a consideration of all the proofs respecting them."

The learned judge of the trial court, in leaving with the jury the question of negligence imputed to the defendant and the counter-charge of contributory negligence, pursued the course required by the issues tendered by the pleadings and as developed by the evidence and declared to the jury the principles of law applicable to all the essential points in the case in language of singular perspicuity.    Therefore, as to the claim of the defendant that the plaintiff and the deceased contributed by their own culpable negligence to the accident and its consequences, the answer is that the verdict of the jury resting upon evidence in which there is at least a substantial conflict, although it can well be said that the proofs appear to distinctly preponderate in favor of plaintiff, is conclusive here.    The burden of showing such negligence upon the part of the deceased or the plaintiff was upon

the defendant, unless plaintiff's evidence itself disclosed contributory negligence, or that the accident and resulting damage would not have occurred but for the inexcusable fault of the deceased or plaintiff.  The proof upon the alleged contributory negligence was purely circumstantial and, in our judgment, exceedingly weak.  The evidence fully supports the verdict.

It is submitted that the court below erred to the prejudice of defendant by refusing to present to the jury, at its request, for findings thereon, certain special questions of fact.  Under the terms of the amendment by the legislature of 1905 of section 625 of the Code of Civil Procedure it is undoubtedly mandatory upon a trial court to submit special issues or particular questions of fact to the jury in all cases, when requested to do so in writing by either of the parties.  In fact, the amendment is so construed in an opinion recently filed, and written by the learned chief justice of the supreme court, in the case of *Plyler* v. *Pacific Portland Cement Co.*, 152 Cal. 125, [92 Pac. 56].  It is said in that case, however, "what the judge has to determine, from an examination of the questions themselves, is whether the parties presenting them have a right to demand their submission to the jury in the form in which they are presented, and this depends, alike in the case of an issue and in the case of a special fact involved in the issues, upon two conditions, first, is the question so framed as to admit of a plain and direct answer? and, second, would an answer favorable to the party preferring the request be inconsistent with a general verdict for his adversary?"

The "special issues" or particular questions of fact requested by the appellant and refused by the court are as follows:

"1st.  Was the wood-pile an obstruction to the free use of the highway in the usual and customary manner?

"2d.  Would the accident have happened if the horse had been under control and driven in the usual and customary manner of driving horses?

"3d.  Was the accident due to the running away of the horse?

"4th.  Did the wood-pile have anything to do with the horse becoming frightened and running away?

"5th.  At the point in the highway where defendant piled its wood, was the main traveled portion thereof sufficiently

wide and safe for the usual, ordinary and customary travel therein by horses under control?''

Where a finding upon a special issue or a particular question of fact would be so inconsistent with the general verdict as to destroy the effect thereof, the former would certainly control, and the party against whom the verdict went would be entitled to judgment *non obstante veredicto.* The question here is: Would a finding favorable to the defendant upon any of the foregoing questions of fact have been inconsistent with the general verdict found? We cannot see where or how there could be any incongruity between the conclusion of the jury as manifested by the general verdict and an answer favorable to the defendant to any of the questions proposed, assuming that the jury would have so answered them. However answered, therefore, we think the findings on the proposed special questions of fact would have been immaterial. It is not contended that the wood-pile was an obstruction to the free use of the highway in the *usual and customary manner;* nor that the accident would not have happened if the horse had been under control and driven in the *usual and customary manner of driving horses;* nor that the accident was not partly due to the ''running away'' of the horse; nor that the wood-pile had anything to do with the horse becoming frightened and running away; nor that the highway, at the point where defendant piled its wood, was not the main traveled portion of the road and not sufficiently wide and safe for the *usual, ordinary and customary* travel therein by horses under control. The contention is, as we hold is his right, that the traveler is entitled to the use of the entire width of the highway as against the interference of private persons and corporations, if he desires to so use it, or in case it becomes necessary to so use it by reason of the happening of such a contingency, so liable to arise at any time upon a highway environed as this, as occurred here. It is not claimed that the deceased was driving the mare, after she started to run, in the ''usual and customary'' way, in the sense in which those terms are ordinarily or colloquially used and understood; but it is contended that while so driving the mare over the public highway, as she had a right to do, the animal became frightened— an event likely to happen at any time under the circumstances—and that by reason of such fright, proceeded over the road at an unusual rate of speed and that, under those cir-

cumstances, she was entitled to the free use of the whole width of the highway, unobstructed or uninterrupted by the unauthorized and negligent acts of a private person, in which to manage, control and probably restore the animal to a state of calmness and composure, without injury to herself or property.   It would be absurd to say that the reining or driving of a "run-away" horse would be driving the animal "in the usual and customary manner of driving horses."   The jury would probably have treated the question as calling for an answer in the sense in which the words "usual and customary" are commonly accepted and used, and such an answer would obviously have meant nothing more than that the deceased was not driving the animal at the usual gait and therefore using only the physical force ordinarily necessary to guide an animal, attached to a buggy, over a road.   And, if the animal had been "under control," in the usual sense of that phrase, she would not have been running with unusual speed, and it is, therefore, manifest that the jury could have consistently answered the question in the negative and yet have intended nothing militating against or impairing the force of the general verdict returned.   If the purpose of the special question was to ascertain from the jury, by a categorical answer thereto, whether the deceased had the animal "under control" in the sense that she was guiding and keeping it, while running, in the center of the highway, the question should have been more clearly phrased and specific.   In the form in which it was requested it was misleading.   The same reasoning applies to special questions 1 and 2, and as to the third it is not contended, nor could it be, that the "running away" of the horse was not a contributing cause of the accident and damage.  This last question, in the form requested, was also misleading.

The motion for a nonsuit presented by the defendant, upon the close of plaintiff's original case, and denied by the court, was based upon grounds involving the vital points in the case herein discussed, and the ruling thereon was, of course, under the views we have expressed, proper.

The judgment is affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 31, 1907.